In the United States District Court
For the Middle District of Pennsylvania

| | | |
|---|---|---|
| United States of America<br>Respondent | ) | |
| | ) | Criminal No.: 3:09-CR-272 |
| vs. | ) | |
| Mark A. Ciavarella, Jr.<br>Movant | ) | |

# <u>Movant's Memorandum of Law in Support of his Emergency Motion for Compassionate Release Under 18 U.S.C. § 3582(c)(1)(A)</u>

## I. <u>Jurisdiction</u>

This court has jurisdiction pursuant to 18 U.S.C. § 3582(c)(1)(A) as modified by the First Step Act of 2018 § 603(b), Pub L. No 115-391,132 Stat 5194, 5239.

## II. <u>Procedural History</u>

Ciavarella incorporates herein the procedural history as set forth in his Emergency Motion for Compassionate Release.

FILED
SCRANTON

MAY 1 9 2022

PER ______
DEPUTY CLERK

Table of Contents

Factual Background........................................................................ 4

Argument ........................................................................................ 6

I. This court has authority to resentence Ciavarella under 18 U.S.C. § 3582(c)(1)(A)(I) as modified by the First Step Act of 2018 § 603(b), Pub. L. No 115-391, 132 Stat 5194, 5239 for the "extraordinary and compelling reasons" created by the Covid-19 Pandemic and the prison conditions which prevent self-care for a high-risk patient ................ 6

II. The Covid-19 pandemic presents a "compelling and extraordinary" circumstance that warrants compassionate release for Ciavarella who is a high-risk fatality patient ................................................ 9

III. The conditions at FCI Ashland foster the spread of Covid-19 and Ciavarella's age and pre-existing medical conditions render him particularly susceptible to an unreasonable risk of death and the inability to take preventative measures of self-care as recommended by the CDC................ 9

IV. The relevant § 3553(a) factors favor resentencing .................................... 12

Conclusion........................................................................................ 24

## Table of Authorities

**Cases:**

United States v. Bailey, No. 94-CR-481 (N.D. III, July 24, 2019) .............................. 21

Dillon v. United States, 560 U.S. 817,819 (2010) .................................................... 12

United States v. Coffman, Middle District of Kentucky, No. 5:09-CR-00181........................ 11

United States v. Jones, No. 12-cr-38 WL 3871084 (W.D. Pa. July 82020) ........................... 12

United States v. McGraw, No. 02-CR-18 (LJM-CMM), 2019 WL2059488
(S.D. Ind. May 9, 2019) ........................................................................ 22

United States v Pawlowski, 967 F.3rd 327,329 (3rd Cir. 2020) .......................................... 12

United States v. Russell, 573 Fed. App 153,154 (3rd Cir. 2014) ........................................ 12

United States v. Spears, No. 3:98-Cr-208-SI-22, 2019 WL 5190877, at *4
(D. Or. Oct. 15, 2019)........................................................................... 21

**Statutes/Rules:**

18 U.S.C. § 3553 ............................................................... 13,14,18-23

18 U.S.C. § 3582(c)(1)(A) ...................................................... 6,8,13,14,21

28 U.S.C. § 994(t) .............................................................. 7

U.S.S.G. § 1B1.13 .............................................................. 7,23

## Factual Background

Ciavarella is guilty of three (3) counts of honest services mail fraud, one (1) count of conspiracy to defraud the United States and four (4) counts of filing false tax returns for the years 2004-2007.

The honest services mail fraud convictions arose out of evidence that Ciavarella and co-defendant, who at the time were judges, arranged to receive a kickback payment in the amount of $997,600 in connection with the roles they played as judges in accomplishing the construction of the PA Child Care juvenile detention facility, and failing to disclose receipt of said money on Ciavarella's annual statement of financial interest.

The tax convictions were based upon Ciavarella's failure to declare the kickback money he received on his 2003 tax return and filing false tax returns in 2004-2007 by taking improper deductions. Ciavarella admitted to committing tax crimes at the time of his trial.

On August 11, 2011, the court sentenced Ciavarella to the 240 months on the three (3) mail fraud counts and ran those counts concurrent to each other. On the count 35 conspiracy to defraud, a sentence of sixty (60) months was imposed. On counts 36-39, filing false tax returns, the court sentenced Ciavarella to thirty-six (36) months under each count and ran them concurrently and consecutive to count 35. The court then ordered the sentence imposed on counts 8-10 honest services mail fraud to run consecutive to the sentence imposed under counts 35-39.

Ciavarella has been in continuous custody since August 11, 2011 and is currently an inmate at FCI Ashland, Kentucky. He has served ten (10) plus years of his sentence and his projected release date is June 18, 2034.

In April of 2020, due to Ciavarella's acute health issues and the Covid-19 pandemic, the staff at FCI Ashland considered Ciavarella for immediate release to home confinement under the CARES Act. Ciavarella's case manager informed him of his selection for early release to home confinement. On April 16, 2020, Ciavarella's case manager had him execute the necessary paperwork for home confinement. Approximately one (1) week later, Ciavarella learned that because he had not served fifty (50) percent of his sentence out date threshold, he was no longer eligible for home confinement. Except for the fifty (50) percent time served requirement, Ciavarella met and continues to meet all other home confinement requirements. The constraint of the percent of time served requirement set out by Attorney General William Barr's directive for release to home conferment fails to adequately address Ciavarella's specific health risks.

On March 7, 2022, Ciavarella filed a request with FCI Ashland Warden LeMaster asking he direct the Director of the Federal BOP to file a motion for compassionate release on his behalf. A copy of this request is attached hereto and marked as Exhibit A. On March 15, 2022, the Warden advised Ciavarella he would not request the Director of the BOP submit a motion for compassionate release. A copy of the Warden's notification letter is attached hereto and marked as Exhibit B.

The sentencing judge never intended to sentence Ciavarella to a death sentence. At the time of sentencing, the late Judge Kosik deviated downward from the sentencing guideline range to avoid doing so. Now, however, because of the unthinkable spread of Covid-19, resulting in a once in a lifetime global pandemic, individuals who, like Ciavarella, suffer from a number of co-morbidity medical conditions are dying at alarming rates.

Ciavarella is seventy-two (72) years old with a date of birth of March 4, 1950. His health became problematic in his mid-forties when he developed hypertension, hypothyroidism, and

hyperlipidemia. Since his incarceration, Ciavarella has also experienced and/or suffered from A-fib, pneumonia, bronchitis, and chronic stage III kidney disease. All of Ciavarella's medical records are in the possession of the BOP and available to the Government.

This unparalleled health crisis in our country and its deadly expansion into our prison system presents "extraordinary and compelling reasons" to grant Ciavarella's motion for resentencing. As detailed below, FCI Ashland is overcrowded beyond recommended capacity and conditions within the prison make it impossible for Ciavarella to self-care. These conditions also make it impossible to prevent the infection now that inmates and guards have tested positive for the Covid-19 virus within the prison.

The humane and compassionate thing to do is convert Ciavarella's sentence to time-served and impose a term of probation or supervised release with or without conditions that do not exceed the un-served portion of the original terms of imprisonment as the court deems necessary.

## Argument

### I. THIS COURT HAS AUTHORITY TO RESENTENCE CIAVARELLA UNDER 18 U.S.C. § 3582(C)(1)(A) FOR THE EXTRAORDINARY AND COMPELLING REASONS CREATED BY THE COVID-19 PANDEMIC AND THE PRISON CONDITIONS WHICH PREVENT EFFECTIVE SELF-CARE FOR A HIGH-RISK PATIENT.

With the changes made to the compassionate release statute by the First Step Act, courts need not await a motion from the Director of the BOP to resentence prisoners under 18 U.S.C. §3582(c)(1)(A) for "extraordinary and compelling reasons." Importantly, the justification of re-sentencing need not involve only terminal illness or urgent dependent care for minor children.

Congress first enacted the modern form of the compassionate release statute, codified as 18 U.S.C. §3582, as part of the Comprehensive Crime Control Act of 1984. Section 3582(c) states that a sentencing court can reduce a sentence whenever "extraordinary and compelling reasons" warrant such

a reduction. 18 U.S.C. § 3582(c)(1)(A). In 1984, Congress conditioned the reduction of sentences on the BOP director's filing of an initial motion to the sentencing court. Absent such a motion, sentencing courts had no authority to modify a prisoner's sentence for compassionate release. Id.

Congress initially delegated the responsibility for outlining what could qualify as "extraordinary and compelling reasons" to the U.S. Sentencing Commission ("Commission"). See 28 U.S.C. § 994(t). The Commission took considerable time to promulgate its policy in response to congress's directive. It acted in 2007, almost a generation later, with the very general guidance that "extraordinary and compelling reasons" may include medical conditions, age, family circumstances, and "other reasons" U.S.S.G. § 1B1.13, app. n 1(A).

After a negative Department of Justice Inspector General report found the BOP rarely invoked its authority under the statute to move for reduced sentences, the Commission felt compelled to act. See U.S. Dept. of Justice, Office of Inspector General, The Federal Bureau of Prisons' Compassionate Release Program, I-2023-006 (April 2013). The Commission amended its policy statement on "compassionate release" in November 2016. See U.S.S.G § 1B1.13 Amend. (11/1/2016). In addition to broadening the eligibility guidelines for sentencing courts, the new policy statement admonished the BOP for its past failures to file motions on behalf of inmates who had met the general criteria identified in U.S.S.G § 1B1.13. See U.S.S.G § 1B1.13. Notably, the Commission concluded that reasons beyond medical illness, age, and family circumstances could qualify as "extraordinary and compelling reasons" for resentencing.

The Commission's actions, however, did little to change the dearth of filings by the BOP on behalf of inmates who satisfied the Commission's general guidance. During the more than three (3) decades during which the BOP was the exclusive gatekeeper for "compassionate release" motions, very

little effort was made to implement Congress's intent to provide a safety valve to correct injustices or allow relief under extraordinary and compelling circumstances.

Finally, this changed with the passing of the First Step Act in 2018. See P.L. 115-391,132 Stat. 5194 at § 603 (Dec. 21, 2018). Section 603 of the First Step Act changed the process by which § 3582(c)(1)(A) compassionate release occurs: instead of depending upon the BOP director to determine extraordinary circumstance and move for release, a court can now resentence "upon motion of the defendant" after the inmate exhausts administrative remedies with the BOP, or after thirty (30) days from the receipt of the inmate's request for compassionate release with the warden of the defendant's facility, whichever comes earlier. 18 U.S.C § 3582(c)(1)(A). Thus, under the First Step Act, a court may now consider the defendant's own motion to be resentenced, without waiting for it to be made by the BOP.

Courts are now authorized to consider a defendant's motion, even one which the BOP opposes, and order resentencing if a resentencing court finds that "extraordinary and compelling reasons" warrant a reduction and such a reduction is consistent with the § 3553(a) factors. Id. Resentencing courts are also advised that any decision to reduce a previously ordered sentence be "consistent with applicable policy statements issued by the Sentencing Commission." Id.

Here, the thirty (30) day period since the warden's receipt of Ciavarella's request for compassionate release due to the threat of Covid-19 infection has passed and no motion for compassionate release has ben filed with this Court by the BOP director on Ciavarella's behalf. Ciavarella made his request that the BOP director file such a motion on March 7, 2022 and on March 15, 2022, he was notified by the warden that his request for the submission of a motion for compassionate relief on his behalf was denied.

Accordingly, based on the above and due to the "extraordinary and compelling reasons" created by the Covid-19 pandemic, the court has authority to re-sentence Ciavarella.

## II. THE COVID-19 OUTBREAK PRESENTS A COMPELLING AND EXTRAORDINARY CIRCUMSTANCE THAT WARRANTS COMPASSIONATE RELEASE FOR CIAVARELLA, WHO IS A HIGH-RISK FATALITY PATIENT.

On March 21, 2020, the World Health Organization (WHO) classified Coronavirus (Covid-19), as a pandemic.[1] Since being classified as a pandemic, the United States has experienced over 81 million confirmed cases of Covid-19 and its variants and nearly a million people have perished from this highly contagious disease.

Individuals such as Ciavarella with pre-existing medical conditions and other co-morbidity factors represent the group of potential patients with high risk for infection and death. Ciavarella is fully vaccinated but that does not mean he is not susceptible to contracting Covid-19 and becoming seriously ill or dying from it. Being vaccinated will offer him protection from serious illness and death but will not make him immune to the virus and suffering serious illness and dying.

## III. THE CONDITIONS AT FCI ASHLAND FOSTER THE SPREAD OF COVID-19 AND CIAVARELLA'S AGE AND PRE-EXISTING MEDICAL CONDITIONS RENDER HIM PARTICULARLY SUSCEPTIBLE TO AN UNREASONABLE RISK OF DEATH AND THE INABILITY TO TAKE PREVENTATIVE MEASURES OF SELF-CARE AS RECOMMENDED BY THE CDC.

Except for inmates who are to be transferred, testing of inmates at Ashland FCI is not conducted. This is even true when transferring inmates test positive for Covid-19. Because testing is limited to the transferring inmates, there is no way to quantify the number of inmates who are infected. If the community outside the prison is reporting Covid-19 contaminations, which it is, a number of prison staff and inmates are undoubtedly infected with the virus.

---

[1] "WHO Characterizes Covid-19 as a pandemic," WHO (March 11, 2020) available at https://www.who.int/director-general/speeches/detail/who-director-general-s-opening-remarks-at-the-media-briefing-on-covid-19---11-march-2020

Conditions of confinement at FCI Ashland create an optimal environment for the transmission of the contagious disease. People who work in the facility leave and return daily; people deliver supplies to the facility daily. This facility received busloads of inmates from the Atlanta facility and the Grayson Regional County jail after transportation had been officially stopped. Public health experts are unanimous in their opinion that incarcerated individuals "are at special risk for infection, given their living situations," and "may also be less able to participate in proactive measures to keep themselves safe" and "infection control is challenging in these settings."[2]

Ciavarella is powerless to take preventative self-care measures directed by the CDC for his high-risk group to remain safe from Covid-19 infection. He cannot self-quarantine or partake in "social distancing" in his prison facility. He is housed in a unit with cells that are nearly sixty square feet in area. Each cell is occupied by two (2) inmates. These units have been locked down or on modified lockdown protocol since March 13, 2020. However, the unit has a common washroom, bathroom with communal sinks, two toilets and one urinal. The communal shower has three stalls. The facility is old. The bathroom has leaks and standing water puddles on the bathroom floor. Because of toilet plumbing leakage, which has been an ongoing problem for over a year, exposed toilet plumbing pipes are covered with fecal stains, as are the ceiling grids. The shower area ceiling is covered with visible green slime mold. The prison is filled beyond its stated capacity creating an even higher density population. Hand sanitizer (with alcohol content), an effective disinfectant recommended by the CDC to reduce transmission rates, is considered contraband in FCI Ashland because of its alcohol content. Correctional health experts worry that no matter what precautions are taken by crowded prisons, these facilities will

---

[2] Achieving a Fair and Effective Covid-19 Response: An Open Letter to Vice President Mike Pence, and other Federal, State, and Local Leaders from Public Health and Legal Experts in the United States" (March 2, 2020) at law.yale.edu/sites/default/files/area/center/ghjp/documents/final_covid-19_letter_from_public_health_and_legal_experts.pdf.

become incubators for the Covid-19 disease and we are witnessing that happening throughout the BOP right now.

Given Ciavarella suffers from significant underlying health issues that make him exceptionally vulnerable to Covid-19, "compelling and extraordinary circumstances" exist to support compassionate release.

The CDC has found that "among adults, the risk for severe illness form Covid-19 increases with age, with older adults at highest risk. Severe illness means that the person with Covid-19 may require hospitalization, intensive care, or a ventilator to help them breath or they may even die." See CDC, People at Increased Risk, Older Adults (July 30, 2020). Also placing Ciavarella at risk for severe illness and possible death from Covid-19 are his chronic type III kidney disease, heart condition, hypertension, and lung issues all documented within his BOP health records.

On July 28, 2020, the DOJ issued a directive that the government shall concede that an inmate, who has one of the risk factors listed by the CDC for greater risk of severe illness from Covid-19, presents an "'extraordinary and compelling reason' warranting eligibility for a compassionate release, even if those non-risk factors in ordinary, non-covid-19 times would not". Cite for the July 28, 2020 DOJ directive is found in the government's brief on remand in the case of United States v. Coffman, Middle District of Kentucky, No. 5:09-CR-00181.

Based upon the DOJ's July 28, 2020, directive and the chronic high-risk medical conditions Ciavarella suffers, the government must accept Ciavarella's medical conditions in conjunction with the Covid-19 virus as "extraordinary and compelling reasons" warranting Ciavarella's eligibility for compassionate release. To not do so would be a direct contravening of the DOJ's July 28, 2020 directive.

## IV. THE RELEVANT § 3553(A) FACTORS FAVOR RESENTENCING.

A district court's authority to modify a sentence in a criminal case that has become final is limited. See Dillon v. United States, 560 U.S. 817,819 (2010), United States v. Russell, 573 Fed. App 153,154 (3rd Cir. 2014). 18 U.S.C. § 3582(c)(1)(A) provides one such source of authorization as amended by the First Step Act, Pub.L. 115-391, 132 Stat. 5194. § 3582(c)(1)(A), as amended, now provides, in relevant part:

> The court, upon motion of the Director of the Bureau of Prisons or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of Prisons to bring a motion on the defendant's behalf or the lapse of thirty (30) days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release, with or without, conditions that does not exceed the un-served portion of the original term of imprisonment), after considering the factors set forth in § 3553(a) to the extent they are applicable if it finds that:
>
> (i) extraordinary and compelling reasons warrant such a reduction, . . . and that such a reduction is consistent with applicable policy statements issued by the sentencing commission.

Ciavarella has unquestionably established the "compelling and extraordinary" reason to warrant a reduction of his sentence. Having established those reasons the court must now consider the relevant sentencing factors in § 3553(a) to determine if a sentence reduction is warranted. 18 U.S.C. § 3553(a)(1)(A)(i). "In considering the § 3553(a) factors, the court should assess whether those factors outweigh the "extraordinary and compelling reasons" warranting compassionate release, particularly whether compassionate release would undermine the goals of the original sentence. United States v. Jones, No. 12-cr-38 WL 3871084 (W.D. Pa. July 82020) citing United States v. Pawlowski, 967 F.3rd 327,329 (3rd Cir. 2020).

In Ciavarella's case, the directive that the court must consider the goals of the original sentence is problematic. Now Ciavarella comes before this court guilty of three (3) counts of honest services mail fraud and five (5) counts of tax fraud. At his original sentencing, this was not the case. At Ciavarella's

sentencing, the court was permitted to factor into its sentence Ciavarella's RICO, RICO conspiracy and money laundering conspiracy convictions. Subsequent to Ciavarella's sentencing, the court vacated these convictions and the government gave notice that it would not retry Ciavarella on the vacated convictions. Because the Government declined to retry Ciavarella for the crimes of RICO, RICO conspiracy and money laundering conspiracy, these convictions are erased and the presumption of innocence is restored to Ciavarella. See Nelson v. Colorado, 137 S.Ct. 1249 (2017), 192 L.Ed 2nd 611 (2011).

Ciavarella having established the "compelling and extraordinary reasons" to warrant a sentence reduction under 18 U.S.C. 3582(c)(1)(A), and because he now comes before the court no longer guilty of RICO, RICO conspiracy, and money laundering, the court is no longer constrained by its decision to not resentence Ciavarella at the conclusion of his 2255 proceeding. For the court to not resentence Ciavarella after he met the "compelling and extraordinary reasons" prong of the Compassionate Release statute by using its 2255 resentencing denial would make the resentencing provisions of 3582(c)(1)(A) a nullity and a contravention of Congressional intent when it amended the Compassionate Release statute pursuant to the First Step Act of 2018. To avoid this result, the court must now resentence based upon Ciavarella's conviction for the crimes of honest services mail fraud and tax fraud.

In its resentencing of Ciavarella, the court will be guided by the § 3553(a) sentencing factors.

The first factor requires the court to examine the "nature and circumstances of the offense and the history and characteristics of the defendant."

Ciavarella is a seventy-two (72) year old first time, non-violent offender. He is currently an inmate at the Ashland Federal Correctional Institution, Ashland, Kentucky. He has been incarcerated since August 11, 2011. At the time of his arrest, he was a judge on the Luzerne County Court of Common Pleas,

having held this position for thirteen (13) years. For most of Ciavarella's time on the bench, he was assigned to the court's civil division and presided over juvenile court.

In late August of 2007, Ciavarella became aware he was being investigated by the Federal Bureau of Investigation. At that time, he was unaware of the nature and scope of the investigation. When it was made known to Ciavarella why he was being investigated, he sought legal counsel. After outlining to counsel his involvement in getting the PA Child Care Facility built and the money Ciavarella received, he was told by counsel he had an honest services fraud problem. Counsel advised Ciavarella that even if the money he received was not a bribe or kickback, his not reporting the source of income and his failure to disclose his relationships on his yearly financial disclosure statement was a clear violation of the honest services fraud statute. Ciavarella asked counsel to provide him with a copy of the statute and applicable case law. After reviewing the state of the law and pertinent cases in effect at that time, there was no doubt in Ciavarella's mind that he was guilty of honest services fraud. Knowing he was guilty, Ciavarella directed his counsel to enter into negotiations with the United States Attorney's office for the entering of a guilty plea to the crime of honest services fraud based upon Ciavarella's failure to reveal his business dealings with the individuals who constructed the PA Child Care Detention Facility and the money he received from them. After extensive negotiations with the United States Attorney's office, it was agreed that Ciavarella and his co-defendant would plead guilty to one (1) count of honest services fraud and one (1) count of conspiracy to commit tax fraud. In exchange for Ciavarella's plea of guilty, the United States Attorney agreed that a term of eighty-seven (87) months imprisonment was fair and reasonable under the facts and circumstances for the crimes Ciavarella was pleading guilty.

In preparation for the entering of Ciavarella's guilty plea, the U.S. Attorney's office presented Ciavarella its proposed factual basis for the plea. After reviewing the document, counsel for Ciavarella advised the Assistant United States Attorney assigned to the case that because the basis of the plea

statement was not factually correct, Ciavarella could not agree to it in its present form. The Assistant U.S. Attorney responded by advising Ciavarella that if he did not agree to the document as prepared, there would be no plea deal. Ciavarella, knowing he was guilty of honest service and tax fraud, and not wanting to lose his eighty-seven (87) month term of imprisonment, agreed to the factual basis for the plea agreement.

On the day Ciavarella's guilty plea was entered, and prior to commencement of the proceedings, the late Judge Kosik called counsel into his chambers. Among the many things discussed was whether or not a gag order was to be imposed. Judge Kosik was reluctant to order one but asked counsel if they would refrain from making any out of court statements to the media. All counsel of record agreed that no court statements would be made. Immediately after the guilty plea proceedings, the Assistant U.S. Attorney, who during the guilty plea hearing told the court the eighty-seven (87) month prison term was fair and reasonable, and in contravention of the agreement to not make any out of court statements, made statements to the media that led to the media's "kids for cash" frenzy.

Ciavarella and his attorneys learned of the Assistant U.S. Attorney's statements when they saw the next morning headlines. Phone calls were made to the U.S. Attorney's office by Ciavarella's counsel. In their conversations with an assistant U.S. Attorney, who was assigned to the case, they expressed their outrage at the violation of the no statement agreement and how it would adversely affect Ciavarella's case. The aftermath of the out-of-court statement caused Ciavarella's case to no longer be an honest services and tax fraud case. It was now a "kids for cash" case.

In late August of 2009, Judge Kosik ruled he would not accept Ciavarella's guilty plea. A joint motion to reconsider was filed and denied. Ciavarella moved to have his plea vacated, not because he was not guilty of honest services fraud and tax fraud, because he was, but he vacated his plea to have his

day in court to disprove the government's allegations that the money Ciavarella received was for the placement of juveniles at the PA Child Care facility.

The superseding indictment contained numerous factual allegations outlining how the "kids for cash" scheme was undertaken and completed. For almost two (2) years, it was these allegations that the government led the public and media to believe it would prove at Ciavarella's trial.

After Judge Kosik ruled he would not accept Ciavarella's plea, Ciavarella and his attorneys spent considerable time preparing to debunk the superseding indictment "kids for cash" allegations. The time and effort Ciavarella and his attorney's made preparing to show there was never a "kids for cash" scheme was for naught. Because after almost two years of the government's allegations that continued to cause media frenzy and public outcry, the government presented zero evidence to prove Ciavarella was involved in a "kids for cash" payment scheme/scandal. Not one iota of credible evidence was presented to prove any of the allegations in the superseding indictment that the money Ciavarella received was to place children at the PA Child Care facility. The proof that Ciavarella's trial had nothing to do with kids for cash became blatantly clear when the government agreed no trial facts were presented that would permit the jury to consider the factual allegations of a scheme for Ciavarella to be paid to place juveniles at the PA Child Care facility. At the conclusion of Ciavarella's trail, with the government's agreement, all facts relating to such a scheme were redacted from the Superseding Indictment. The fact Ciavarella's trial was not a "kids for cash" scandal is borne out by a juror's post-sentencing statement when she said, "we were not jurors on a 'kids for cash' case . . . that was not what our trial was about." See Exhibit D attached hereto and made a part hereof.

Despite Ciavarella's trial having nothing to do with "kids for cash" and the allegations of such conduct being redacted from the trials record, the government used the redacted facts in its post-trial filings. Facts the courts then used in its opinions to deny Ciavarella's requested relief.

Not only did Ciavarella not have the opportunity to prove he was never involved in a "kids for cash" scandal, he was punished as if it had actually happened. The government got the punishment it wanted without having to ever present evidence of the "kids for cash" scandal or give Ciavarella the opportunity to prove it had never happened.

When all was said and done, the jury convicted Ciavarella of accepting one (1) bribe and not guilty on all allegations of extortion. Ciavarella points this out, not to downplay his convictions. The honest services mail fraud and tax fraud violations are serious crimes and are not to be taken lightly. Ciavarella points out his convictions not to downplay his conduct in committing them but with the hope the court will consider the facts, circumstances, and nature of the crimes Ciavarella is guilty of committing. Not the crimes he is innocent of or the crimes the government never brought before the jury when it had the chance to do so.

The second § 3553 sentencing factor is concerned with the need for the sentence imposed and how the sentence reflects the seriousness of the offense and how the sentence will promote respect for the law and provide just punishment. It also requires the sentencing judge to create a sentence that affords adequate deterrence to criminal conduct and to protect the public from further crimes of the defendant. The last consideration under the second sentencing factor is the crafting of a sentence that will provide the defendant with needed educational or vocational training, medical care, and other effective correctional treatment.

Ciavarella's honest services and tax fraud violations constitute serious criminal conduct on his part and warrant just punishment. Ciavarella has ben incarcerated for more than nine (9) plus years. A significant period of time that reflects the seriousness of the crimes he is now convicted of committing – a period of time that promotes respect for the law and is just punishment for his honest services and tax fraud crimes. Ciavarella's criminal history is free of violence and his offense conduct did not involve

violence. As a result of his convictions, he no longer holds a license to practice law and his felony convictions prohibit him from ever again holding judicial office. Ciavarella has never received any incident reports. He has participated in educational vocational training. Ciavarella has been involved in extensive rehabilitation programming. His in-prison educational, vocational, and rehabilitating programs include the following: Microsoft Word, Microsoft Excel, Microsoft Word 2-CAI, Microsoft Word 1-CAI, Keyboarding-CAI, Cage Your Rage Anger Management, A and O Wellness AT RISK, Victim Impact, Sanitation Ace Class, Tutor Training, and Moving Mountains and the Case for Christ. Ciavarella has been rated minimum for recidivism by the BOP PATTERN System. See Exhibit C attached hereto.

The third § 3553 sentencing factor requires the court to consider the sentences available. Without question, incarceration is a viable sentence as is probation and supervised release. The court has the option to find Ciavarella has served sufficient time for his crimes of honest services and tax fraud. The court could also reduce Ciavarella's term of imprisonment and impose a term of probation or supervised release with or without conditions, with one such condition to convert the remaining years of his imprisonment to home confinement as a condition of supervised release. In this way, Ciavarella continues to face confinement as a measure of due punishment but without the risk of his physical health. This is exactly what the BOP staff at Ashland FCI has considered when they submitted Ciavarella for early release to home confinement in April 2020 and in accordance with the CARES Act and AG Barr's memorandum. However, Ciavarella could not qualify without completing fifty (50) percent of his good time sentence. If Ciavarella had met the fifty (50) percent time-served requirement, he would have been released to home confinement to serve out his sentence. This treatment was to address the life threatening health risk to Ciavarella that the DOJ and BOP recognized and attempted to address. The arbitrary cut off at needing fifty (50%) of good time credit sentence served creates a

difference without distinction. Ciavarella was chosen for home confinement because of his medical profile and the recognition by the BOP that he no longer represents a threat to the community and that he qualifies as a good candidate for home confinement. Because of the BOP's administrative procedural constraints, the decision for home confinement is now in the hands of this court. This court has both the authority and discretion to do what the BOP attempted to do for Ciavarella – to release him to home confinement in order to save his life.

The fourth § 3553 sentencing factor requires the court to analyze the kind of sentence and the sentencing range established for the applicable category of offense committed by the applicable category of defendant.

The crimes the court must now consider for resentencing purposes are honest services mail fraud and tax fraud. These are the offenses that Ciavarella is now guilty of committing and the only crimes for which he can be resentenced. His prior PSI cannot be the basis for calculating his guideline range. The guideline range for purposes of resentencing must be made based solely upon the crimes of honest services mail fraud and tax fraud. The crimes of RICO, RICO conspiracy and money laundering conspiracy played a significant role in computing his guideline range in the original sentencing; however, these crimes no longer have a role to play in his resentencing. Without these convictions, the rationale and basis for Ciavarella's original sentencing enhancements no longer apply. Without these enhancements, Ciavarella's original sentencing guidelines are significantly reduced. A reduction that would permit this court to enter a sentence of time-served.

Even if the court finds the original sentencing guidelines are the ones the court must follow, a finding Ciavarella opposes, and give pause to the court to disfavor resentencing are largely overcome by the unreasonable threat of death in Ciavarella's current conditions of confinement. The government cannot dispute the serious physical danger created by the current pandemic to someone with Ciavarella's

medical profile, especially now that the virus has found its way into the prison and the threat it poses to Ciavarella's health and well-being. If Ciavarella contracts the virus, it will most likely kill him. A result the sentencing court never intended to impose at the time of Ciavarella's original sentencing.

The recently amended compassionate release statute at § 3582(c)(1)(A) gives this court numerous resentencing options. The court can sentence Ciavarella to time-served. It can reduce Ciavarella's original sentence to a term of imprisonment the court deems appropriate for his committing the crimes of honest services mail fraud and tax fraud or it "may impose a term of probation or supervised release with or without conditions that do not exceed the unsupervised portion of the original term of imprisonment." Under this section of the Compassionate Release statute, the court could impose a term of home confinement as a condition of Ciavarella's resentencing. An appropriate period of home confinement will meet § 3553(a)'s purpose to give due respect for the law and acknowledge the seriousness of the offenses.

Congress's expansion of the compassionate release statute by § 603 of the First Step Act reflects congressional intent for courts to have greater flexibility to reduce sentences when compelling circumstances justify a later review. The title of the amendment, "Increasing the Use and Transparency of Compassionate Release," accentuates that intent. The evolving case law also demonstrates the courts have constrained their discretion generally to effectuate Congressional desire to increase the use of the Compassionate Release statute encouraged by this amendment. Significantly, courts weighing § 3553(a) factors have granted release to defendants with convictions for serious crimes and with histories of violence, finding that changed health circumstances, aging defendants, post-offense rehabilitation, and carefully crafted conditions of supervised release ameliorate public safety concerns.

In United States v. Bailey, for example, the defendant was sentenced to thirty (30) years for "an extensive racketeering scheme," including a specific finding that the defendant committed offenses relating to murder. Bailey, No. 94-CR-481 (N.D. Ill. July 24, 2019) (Slip op. at 1). The parties agreed that the defendant, who was ninety (90) years old and suffered from multiple health issues, had satisfied the statutory requirements for compassionate release. However, the government opposed release under the Section 3553(a) factors due to the "reprehensible nature of the offense." The court acknowledged that the defendant's criminal history and serious offense conduct supported a denial of the requested reduced sentence. But the court weighed the more recent factors in the defendant's favor, including his institutional adjustment, lack of disciplinary infractions, his advanced age, and his release plan, and concluded that they "point in the opposite direction [ ]." Id. In weighing these more recent favorable factors over the defendant's past criminal history, the court granted the reduced sentencing request, concluding that release at this stage of the defendant's life would not minimize the severity of the offense and the defendant no longer posed any credible threat to the public. Id. at 2

In a District of Oregon case, the court likewise granted compassionate release to a defendant, who was serving a 30-year sentence for leading a "major drug conspiracy." United States v. Spears, No. 3:98-Cr-208-SI-22, 2019 WL 5190877, at *4 (D. Or. Oct. 15, 2019). As in the court's opinion granting release, the defendant's history included crimes of violence, his performance on supervised release had been poor, and he committed the last serious offense for which he was serving imprisonment when he was in his fifties. Id. at *4. Despite these findings, the district court found that the defendant was now seventy-six (76) years old and suffered from "multiple chronic serious medical conditions and limited life expectancy." Id. at *1. Although

the government argued that the defendant remained dangerous, the court disagreed. The court concluded that, in light of the defendant's strong family support, the age of his prior convictions, and his diminished physical condition, "appropriate supervision conditions can mitigate any limited risk" to public safety and provide specific deterrence. Id. at *5.

Similarly, in United States v. McGraw, No. 02-CR-18 (LJM-CMM), 2019 WL2059488 (S. D. Ind. May 9, 2019), the court granted compassionate release from the defendant's life sentence for a drug trafficking conspiracy based on the defendant's serious health concerns and diminished ability to provide self-care under commentary note 1(A)(ii) of U.S.S.G. § 1B1.13. The defendant, who was approximately fifty-five (55) years old at the time of the offense, was seventy-two (72) years old at the time of the court's release opinion and suffered from limited mobility, diabetes, and chronic kidney disease. Id. at *2. The government argued that the defendant remained a danger to the community because of his leadership in a notorious motorcycle gang, noting that he could continue his criminal activity with simple access to a telephone. Id. at *4. The court, however, concluded that given the defendant's frail health, his positive record at the institution, and the ability of the court to impose conditions that would reasonably assure the safety of the community upon release, the more flexible compassionate release statute, as amended by the First Step Act, favored granting the defendant's motion. Id. With respect to the § 3553(a) factors, the court concluded that the "significant sanction" the defendant had already served was sufficient:

> But further incarceration is not needed to deter Mr. McGraw from further offenses; nor for reasons described above, is it necessary to protect the public form future crimes. Finally, Mr. McGraw has served much of his sentence while seriously ill and in physical discomfort. This means that his sentence has been significantly more laborious than that served by most inmates. It also means that further incarceration in his condition would be

> greater than necessary to serve the purposes of punishment set forth in § 3553(a)(2).

Id. at *5. The court imposed lifetime supervision to "continue to serve as a sanction and general deterrent, appropriately recognizing the seriousness of Mr. McGraw's conduct." Id. at *4. As amplified in the cited cases above, release of an infirm Ciavarella under the current extraordinary and compelling circumstances of the threat of a novel contagion contaminating the prison would not serve to diminish the seriousness of the offense of conviction, but would fulfill Congress's intent in offering courts greater flexibility to reduce sentences when changed circumstances justify a later review. Ciavarella's pre-existing health conditions, his age, and the rapidly advancing Covid-19 outbreak, together with the prison environment's constraint on allowing Ciavarella to take self-care measures directed by the CDC to remain safe during the outbreak, warrant a reduced sentence in this case.

As an additional 3553(a) sentencing factor, the court must consider if Ciavarella has established remorse for his crimes and how they hurt those who were affected by them. At the time of his sentencing, Ciavarella apologized to his wife, children, and their spouses. He apologized to his sisters, in-laws, uncles, aunts, and friends. In Ciavarella's apology to them, he expressed how sorry he was for the pain and hurt his conduct caused them to endure.

Ciavarella apologized to the citizens of Luzerne County for violating their trust and hoped one day they could forgive him for misplacing their trust.

Ciavarella apologized to the Luzerne County Bench and Bar for casting a cloud of corruption over it. He expressed his sorrow for them being painted with the brush of his wrongdoings.

Ciavarella apologized to the judges who were affected by the scandal he created and how it made an already difficult job more difficult. He acknowledged that his actions strained the

public trust in the judiciary. He prayed the public would understand how one person who made bad decisions should not reflect poorly on the good men and women who make up the judicial system.

Ciavarella apologized to the juveniles who appeared before him and asked them to forgive him for being a hypocrite for not practicing what he preached. He hoped they would learn from his mistakes and realize everything they do in life has consequences and that there are dire consequences for knowingly made wrong decisions.

Ciavarella publicly stated how sorry he was for the criticism and ridicule the Juvenile Probation Department received because of his misconduct. He humbly expressed his sorrow for the unwarranted criticism the employees of the probation department received because of what he did. See Appellate Index Volume 10 pp 1481-1482.

Ciavarella's public apologies were sincere and heartfelt and will remain so until he breathes his last breath.

**Conclusion**

For the foregoing reasons, Ciavarella respectfully requests that this Court grant a reduction in his sentence to time-served with an extended period of supervised release, which may or may not include an appropriate period of home confinement.

Respectfully submitted,

Mark A Ciavarella, Jr.

Mark A. Ciavarella, Jr., Defendant, Pro Se
Inmate # 15008-067
FCI Ashland
P.O. Box 6001
Ashland, Kentucky 41105

BP-A0148 **INMATE REQUEST TO STAFF** CDFRM
JUNE 10

**U.S. DEPARTMENT OF JUSTICE** **FEDERAL BUREAU OF PRISONS**

| TO: (Name and Title of Staff Member) | DATE: |
|---|---|
| David LeMaster, Warden | 3-7-22 |
| FROM: Mark Ciavarella | REGISTER NO.: 15008-067 |
| WORK ASSIGNMENT: Compound 2 AM Orderly | UNIT: B |

SUBJECT: (Briefly state your question or concern and the solution you are requesting. Continue on back, if necessary. Your failure to be specific may result in no action being taken. If necessary, you will be interviewed in order to successfully respond to your request.

I am formally requesting you to direct the Director of the Federal BOP To file on my behalf a motion for compassionate release pursuant to USC. 3582(c)(1)(A) for "Extraordinary and Compelling" reasons, to wit, the continuing spread of Covid 19 within the Ashland FCI and Federal Prison System together with my co-~~most~~ mobidity factors of hypertension, A-Fib, past history of Bronchitis, pneumonia, hyperlipimedia, Chronic Kidney disease, hypothyroidism, and age of 72

In April of 2020, pursuant to my Case Manager's directive a release plan was submitted. This plan continues to be the plan I will implement upon release.

(Do not write below this line) Submitted March 7, 2022

DISPOSITION:

See attached.

| Signature Staff Member | Date |
|---|---|
| S. [signature], RIS COORD. | 3-15-22 |

Record Copy - File; Copy - Inmate

PDF Prescribed by P5511

This form replaces BP-148.070 dated Oct 86 and BP-S148.070 APR 94

FILE IN SECTION 6 UNLESS APPROPRIATE FOR PRIVACY FOLDER **SECTION 6**

Exhibit A

Institution Response - Inmate Request to Staff Member
Federal Correctional Institution
Ashland, Kentucky 41105

Inmate Name: CIAVARELLA, Mark A JR.
Register Number: 15008-067
Work Assignment: COMP 1 AM
Unit: E

This is in response to your Inmate Request to Staff Member, dated March 7 2022, in which you requested a reduction in sentence (RIS) based on concerns about COVID-19.

Title 18 of the United States Code, section 3582(c)(1)(A), allows a sentencing court, on motion of the Director of the BOP, to reduce a term of imprisonment for extraordinary or compelling reasons. BOP Program Statement No. 5050.50, Compassionate Release/Reduction in Sentence: Procedures for Implementation of 18 U.S.C. §§ 3582(c)(1)(A) and 4205(g), provides guidance on the types of circumstances that present extraordinary or compelling reasons, such as the inmate's terminal medical condition; debilitated medical condition; status as a "new law" elderly inmate, an elderly inmate with medical conditions, or an "other elderly inmate"; the death or incapacitation of the family member caregiver of the inmate's child; or the incapacitation of the inmate's spouse or registered partner. Your request has been evaluated consistent with this general guidance.

The BOP is taking extraordinary measures to contain the spread of COVID-19 and treat any affected inmates. We recognize that you, like all of us, have legitimate concerns and fears about the spread and effects of the virus. However, your concern about being potentially exposed to, or possibly contracting COVID-19, does not currently warrant an early release from your sentence. Accordingly, your RIS request is denied.

If you are not satisfied with this response to your request, you may commence an appeal of this decision via the administrative remedy process by submitting your concerns on the appropriate form (BP-9) within 20 days of the receipt of this response.

[signature] 3-15-2022

David LeMaster, Warden Date

Exhibit B

# FSA Recidivism Risk Assessment (PATTERN 01.02.01)

**Register Number:15008-067, Last Name:CIAVARELLA**

**U.S. DEPARTMENT OF JUSTICE** **FEDERAL BUREAU OF PRISONS**

| | |
|---|---|
| Register Number: 15008-067 | Risk Level Inmate....: R-MIN |
| Inmate Name | General Level......: R-MIN (-19) |
| Last.........: CIAVARELLA | Violent Level......: R-MIN (-8) |
| First........: MARK | Security Level Inmate: LOW |
| Middle.......: A | Security Level Facl..: LOW |
| Suffix.......: JR | Responsible Facility.: ASH |
| Gender.........: MALE | Start Incarceration..: 08/11/2011 |

**PATTERN Worksheet Summary**

| Item | Value | General Score | Violent Score |
|---|---|---|---|
| Current Age | 71 | 0 | 0 |
| Walsh w/Conviction | FALSE | 0 | 0 |
| Violent Offense (PATTERN) | FALSE | 0 | 0 |
| Criminal History Points | 0 | 0 | 0 |
| History of Escapes | 0 | 0 | 0 |
| History of Violence | 0 | 0 | 0 |
| Education Score | HighSchoolDegreeOrGED | -4 | -2 |
| Drug Program Status | NoNeed | -9 | -3 |
| All Incident Reports (120 Months) | 0 | 0 | 0 |
| Serious Incident Reports (120 Months) | 0 | 0 | 0 |
| Time Since Last Incident Report | N/A | 0 | 0 |
| Time Since Last Serious Incident Report | N/A | 0 | 0 |
| FRP Refuse | FALSE | 0 | 0 |
| Programs Completed | 10 | -6 | -3 |
| Work Programs | 0 | 0 | 0 |
| | Total | -19 | -8 |

Exhibit C

PRINTTHIS

timesleader.com
NORTHEASTERN PENNSYLVANIA'S HOMEPAGE

August 13

# Juror: Sentence 'excessive'

By Terrie Morgan-Beseckertmorgan@timesleader.com
Law & Order Reporter

CLIFFORD TWP. – One of the jurors in Mark Ciavarella's corruption trial said she thinks the 28-year prison sentence imposed upon him was excessive given the charges for which he was convicted.

Patricia Sinco, 64, said she's disturbed by the fact U.S. District Judge Edwin Kosik was permitted to consider evidence that Ciavarella jailed juveniles for cash when that claim was never presented at the trial.



click image to enlarge

Patricia Sinco, a juror in the Ciavarella trial, says she believes the 28 year sentence given to the former judge was excessive.

*Don Carey/The Times Leader*

Select images available for purchase in the Times Leader Photo Store

"We were not jurors on a 'kids for cash' case," Sinco said. "That was not what our trial was about."

Ciavarella, 61, was found guilty in February of 12 charges for accepting nearly $1 million from developer Robert Mericle, who built the PA and Western PA Childcare juvenile detention centers. He was acquitted of 27 other charges relating to his alleged extortion of money from the centers' one-time co-owner, Robert Powell.

Despite Ciavarella's acquittal on the Powell charges, Kosik was permitted to consider the alleged extortion as "other relevant conduct" in determining Ciavarella's sentence.

The judge was also permitted to consider reports by two panels that investigated Ciavarella's handling of juvenile court and allegations that the money he accepted was a kickback for jailing juveniles at



Exhibit D

Nelene



Powell's centers.

Sinco questioned why that that information was permitted to be considered.

"That's not what we found him guilty of. Why was he being sentenced for something he was found not guilty?" Sinco said. "I guess the law says it's legal to bring that in. They certainly would not bring it in if it were not legal."

Sinco said jurors agreed that the money Mericle paid Ciavarella was a legal finder's fee to reward Ciavarella for recommending Mericle as the builder. It was illegal for Ciavarella to take the money, however, because he was the county's juvenile judge.

They flatly rejected Powell's testimony that he was extorted, however.

"We did not believe anything Mr. Powell said," she said.

Sinco said most of the jurors believed that Conahan was the main player in the case and that Ciavarella got "caught up" in the scheme.

"Most of us felt Ciavarella was guilty by association. Not that he was completely clean," she said. "We didn't believe Ciavarella knew the depth of what was going on."

She said the panel found him guilty of more charges than it otherwise would have based on its belief he had conspired with Conahan the disguise the source of the Mericle money.

"The judge told us, once we found them guilty of conspiring together, anything that judge Conahan did, judge Ciavarella was guilty of as well because of the conspiracy," she said. "If it were not for that, many things we would not have found him guilty of."

Sinco said she will be interested to see what type of sentences are handed down against Conahan, who pleaded guilty last year to one count of racketeering conspiracy, as well as Mericle and Powell, who also entered pleas to charges related to the case.